Okay, council is ready. The next argued case in this series, again in the order of the appeals, is number 16, 2054, X, Y, LLC against Trans Ova Genetics. Mr. Osler. Thank you, Your Honor, and good morning to the panel. My name is Charles Osler. I'm sorry, go ahead. You're allowed to say your name and then ask my question. Charles Osler on behalf of the defendant, Trans Ova Genetics, L.C. Okay, I have a couple of minor questions before we get to the meat of this. First of all, in this third case we have this morning, the 425 patent, or some of the claims of the 425 patent, were held unpatentable, and that, as I understand it, is one of the patents here where there was the stipulation of infringement and the jury awarded a lump sum of damages, including damages for 425. Am I correct about that? I believe so. So, is your argument that if we were to sustain the board's holding of the 425 claims not being patentable that there would have to be a remand here? What are we supposed to do? I believe that's correct. Okay, my second question is, all this argument about willfulness, what difference does it make? There was no award of enhanced damages or attorney's fees, there's no appeal from the refusal, why do we care whether there was willfulness or not? Why is that issue significant? Your Honor, I would agree that it is not among the most significant issues here. But it has no significance? Well, I would say simply this, a finding of willfulness has an impact on a party. Reputational? It doesn't. Okay. Well, unless we were to reinstate the jury's position. That's true. Okay, proceed. But our position on willfulness, I would agree, Your Honor, that that is not a significant issue in this appeal, but rather the antitrust and ongoing royalty issues we would submit should be the focus, I would like to focus on those issues, beginning with the antitrust. Okay. Tell us what you believe are the significant issues. The centerpiece of this appeal is an antitrust trial that never happened, and that was a Sherman Section 2 monopolization, attempted monopolization trial against Ingrin and XY that did not occur in this jury trial. And the reason it didn't occur is because the district court on the motion for summary judgment dismissed those claims, both against XY and Ingrin, on the grounds of statute limitations, and mentioned but, in our view, did not address the evidence of new and accumulating injury that was put forward in the opposition to the motion for summary judgment. As I understand the district court's position, to use the continuing conspiracy exception on statute of limitations, it was your burden to come forward with at least some amount of evidence and argument per sela text to meet the two elements of the continuing conspiracy exception. And the court below determined that you didn't really identify or explain in any kind of sufficient way how you would fulfill the second element of that two-element test, that is to say the new and accumulating injury. And so it's almost like a failure to plead something to meet your burden. And so therefore, he felt like on that technical ground, he was going to grant summary judgment given that that was your burden, or that would have been your burden at trial. Can you explain where the error is in your view of what the court said and did? Yes, Your Honor. First, I would agree that it was Transova's burden to demonstrate a triable issue of fact with respect to new and accumulating injury. Absolutely agree. Where the disagreement arises is whether with all favorable inferences given to Transova, which we believe the district court did not do, whether or not a genuine issue of material effect existed. And what we think happened, because that evidence is in the record. The court acknowledged, in particular, the long-term customer contracts that were alleged to be anti-competitive and indeed were found to be anti-competitive in the ABS case against Inger. The district court mentioned the evidence, did not analyze the evidence, did not extend those inferences that were appropriate under Rule 56. And what we think happened, and I think it's evident when you look at Joint Appendix 41 to 43, the court conflated damages and injury. The court went off on an analysis of Dr. Doremus, the damages expert, Transova's damages expert, testimony regarding whether damages under the antitrust claims and under breach of contract claims might be the same or consistent, which he acknowledged that could be. I guess the point I saw the district court say was, he didn't see Dr. Doremus identify something that could be regarded as a new and accumulating injury. And neither did you in your opposition to the summary judgment motion. I would agree that he, what I would say is, that evidence was there. The district court didn't look at it and turn to evaluating on merits. There's nowhere in the district court's initial opinion or reconsideration where the district court evaluated the evidence of new and accumulating injury that had been put forth. In particular, the long-term customer contract. The refusal to deal cases seem to suggest that there's no new injury if the refusal to deal was final. I guess the theory is here that the 2007 refusal to deal was final. The problem with that is that the jury found that the 2007 refusal to deal was a breach of the contract. So if they wanted to continue to refuse to deal with you, they had to do something else other than the 2007 termination. In other words, that wasn't a final action on their part because it was ineffective. Yes, Your Honor. I would agree. And if you look at the case law, the Tenth Circuit case law, in terms of looking at whether the 2007 termination letter was a final act, because that's the touchstone of the analysis here under Tenth Circuit law. And the language used is very, very strong. In the champagne medals case, irrevocable, immutable, and final. Immediately and permanently destroy Transova's business. Completely and permanently exclude Transova. The 2007 termination letter didn't accomplish any of those things. In fact, one of the allegations is that the parties continued to negotiate over the terms of a revised license, alleged to be a bad-face negotiation. They continued to engage each other, ultimately resulting, unfortunately, in this lawsuit, which defies the logic of the notion that the 2007 termination letter was final in the sense of finality, as Your Honor refers to, in the sense articulated by the Tenth Circuit. Well, I think trying to understand the Tenth Circuit case law really matters here. And so you mentioned champagne medals. Champagne medals, there was this horizontal boycott decision by all these distributors to try to knock out champagne medals. And then in order to put that into effect, it needed to pressure all these mills into not selling aluminum to champagne medals, which it did. But all those additional actions took place inside the statute of limitations period, whereas the original horizontal boycott agreement occurred outside. And so for that reason, because of the way the anti-competitive conduct was structured, there needed necessarily to be those additional actions in order to carry out the alleged unlawful action. Here, we have just a single party, XY, who has refused to permit you to use their patented technology, arguably unlawfully, when it terminated the license. But then it didn't need to do anything else beyond that act with anybody else, like the defendants did in champagne medals, or the defendants did in Hennigan, the Ninth Circuit opinion, where the souvenir shops were paying off the tour operators. Or in a more recent Tenth Circuit opinion called Aurora. Are you familiar with that one? Yes, sir. Okay, where the University of Colorado Denver was continuing to enforce an agreement with Campus Village to keep out Regency from being able to house freshmen. You know, every new class of freshmen were basically blocked from living in Regency. So those cases all seem to show there's this extra overt act, usually with somebody else, in order to be a continuing conspiracy. I don't see that here. How does this fact pattern fit with those fact patterns? Your Honor, I think the best answer to that is the long-term exclusive contracts with third parties, with suppliers, it seems, that Ingren entered into. After, within the limitations period, Select Sires was one such supplier. Those were analogous to the additional acts that Your Honor referred to in the Tenth Circuit opinion. But what did those contracts do? Those contracts locked up suppliers into long-term agreements that we were led to, and effectively prevented those suppliers from using, for example, TransOva's technology. So, Your Honor, I would submit that those are acts with third parties. TransOva's technologies, though, were predicated on being able to use XY's patented technology, right? And so you were blocked from XY's patented technology with the termination letter, with the refusal to permit you to use XY's patented technology, arguably unlawfully, when they breached it, right? Through the termination letter. I mean, the termination letter, we can regard it as a breach of contract, fine. But it's also a decisive shot to block you from using their patented technology. It wasn't. It was ineffective. And the jury found it was a violation of XY's duty of fair dealing and good faith, and that it constituted an unclean hand. So it was ineffective. But that's the unlawful action, right? Your Honor? That's the unlawful action. That is the first unlawful action. I mean, if it was lawful, right, then we wouldn't have an antitrust problem. You're absolutely right. That's your antitrust problem, or your allegation, that they committed this material breach of the license. That is the first allegation. That is the first step in what we allege to be a continuing set of anti-competitive acts, which occurred not only with respect to TransOva, but also with respect to third parties, fitting into the 10th Circuit case law about where are the additional acts that effectuated what had been initially done. And here— But did you then identify in the opposition to the summary judgment what the injury was? You certainly identified a series of acts, but what was the new injury that you needed to identify? Champagne Metals, there's a footnote there that explains what Champagne Metals' new injury was once the other distributors pressured the mills. It was the fact that Champagne Metals now had to pay a higher price than it would have otherwise because it wasn't able to bargain with all the available mills there that were selling aluminum. That was its new injury after the unlawful actions that took place inside the statute of limitations period. What did you do that Champagne Metals apparently did in your opposition to summary judgment to identify a new and accumulating injury from all the evidence of new alleged acts? Your Honor, what we did was allege that, for example, the long-term customer contracts further damaged, further hampered TransOva's ability to compete in the marketplace for these services. And we further allege that, and again, as Champagne Metals acknowledged, you look at the type of antitrust violation involved, this wasn't a boycott. So I understand and agree with the Court's characterization, but here you had a different kind of violation. You had an attempted monopolization by not only XY, but also Ingrin. And Ingrin was never before this jury. In fact, it was a stipulated jury instruction after the dismissal of Ingrin that specifically told the jury you are not to evaluate any anti-competitive conduct of Ingrin. But to your question, Your Honor, on summary judgment, there was sufficient evidence that especially the long-term customer contracts constituted new and accumulating injury that satisfied the second prong of the continuing conspiracy exception. Particularly on summary judgment, it was not TransOva's burden to prove that that injury had occurred. Well, I guess your theory is that because the termination was ineffective, you would have been in a position to offer an alternative to these customers that were subject to the long-term contract. Exactly correct. I'm sorry, could you repeat that? TransOva's position was from the outset that that attempted termination was ineffective. And, you know, if you look at the record, so was XY continued to deal with us. Well, but the point is that in terms of these new contracts, these long-term contracts with these other people, that if the termination was ineffective, you would have been in a position to offer the technology because you would still have had a license under the agreement. That's correct. And the license was not properly terminated. It didn't expire until April 2009. All right, let's hear from the other side. And we'll pursue this a bit further. Thank you. Mr. Shah? May it please the Court. Pateek Shah for Appellee Cross-Appellant XY. Unless the Court prefers otherwise, I'll first address the antitrust issue and then— Well, let me just ask you the same questions I asked opposing counsel. Do you agree that if, in this third case, we were to sustain the invalidation of the 425 patent claims, we'd have to remand here for a new trial on damages? I don't think that would actually be necessary, Your Honor. In our red brief at footnote 8, we explain what the Court did in the damages section or what the experts, I should say, did with respect to the damages, is they grouped the 425 patent with the other two freezing patents. And essentially, the evidence they grouped for damages purposes, they grouped them into three groups. So that 425 patent is grouped with the other two patents. And the expert testimony from XY at trial, which the Court found that the jury essentially adopted because it mapped onto the damages verdict, essentially described a hub-and-spoke distribution method that you would have to use all three patents in conjunction to make that hub-and-spoke distribution method work. Either you freeze them on site and then send it off for sorting or you send it off for sorting and then freeze it. And because you would need all three of those patents to make it work, the fact that one of those three patents were invalidated wouldn't affect the damages. Okay, but I understand the argument, but isn't this something we should let the District Court sort out if that comes to pass? Your Honor, it's certainly within this Court's discretion to remand to allow the District Court. The one thing I would point out is they have never requested that relief in their blue brief. We raised it in the red brief and said no remand is necessary. They don't come back and reply and dispute that either. So as far as we're concerned, they have never asked for that relief and they've waived that relief, but of course it's within this Court's discretion to send it back if it would like to. And on the willfulness, you agree there are no consequences there? Yes, Your Honor. I don't think the Court needs to reach that issue. In our view, it's been waived anyways. Okay, why don't you go ahead with the antitrust. Sure. So I think the antitrust, before you even get into the merits of the Tenth Circuit case law, here we have a more fundamental threshold defect of sort of Civil Procedure 101 under the Supreme Court standard in Zolotex. They had the dispute to point – they had the burden to point to the District Court in its summary judgment record – in its summary judgment brief to at least some evidence in the record that would allow a triable issue of fact on the new injury element. They filed a reconsideration brief. They filed two appeal briefs and had oral argument. They still cannot point to where in their summary judgment response they point to evidence of new injury from anything. And the reason that's critical is District Court's summary judgment – the Supreme Court has made this clear, Tenth Circuit law makes it clear – it's not the District Court's burden to rummage through the record and find, oh, well, let me connect this act to this new injury. They cannot point to anything in the summary judgment papers itself that identifies this evidence. And the District Court – Well, when you say they didn't identify any evidence, I guess their evidence would be the acts, right? Right. So, like, bad faith negotiations, threats to file a lawsuit, refusal to carry out terms of license, and then finally these locking in customers with these exceedingly long contracts. Yes, Your Honor. They allege all of those acts. That's true. So that's what – I guess I'm wondering why isn't that the evidence that they pointed to in their opposition to the summary judgment? Well, the reason is because all of those acts could equally have caused no new injury. That is, the 2007 termination, which, of course, they allege was ineffective, but that's the – No, they don't allege that it's ineffective. The jury found it was ineffective. The jury did find it, but at the time of summary judgment, the relevant allegations are there for their inner antitrust claim, the linchpin of their antitrust claim, and it was borne out that the 2007 termination letter was invalid, right? If that was invalid and the jury found it was, then all of the acts that they allege don't cause a new injury. They just reinforce that same injury. That is, it was improper. Well, I'm not following this entirely. Let's take the long-term contracts, for example, which were entered into during the – after the four-year period, right? That were entered into afterwards, yes. Yeah. And they're saying that caused injury, and the argument is, well, no, it couldn't have because they terminated the license agreement earlier and they wouldn't have been in a position to offer this technology in competition with these long-term contracts. But the fact is that they could have because the license agreement wasn't terminated, so they would have been a licensee and able to do that. Why doesn't that show continuing injury from new acts that occurred after the four-year period? A couple responses there, Your Honor. Whether – at the time they alleged this, nobody knew whether the 2007 termination letter was valid or not. So they had to make allegations where, even without the 2007 termination letter, that they would have been able to, say, for example, supply these customers and do that. But they have not – they didn't make any allegation. Allegation is the wrong word. At summary judgment, they have to point to evidence. They didn't point to any evidence that customers would have signed up for them with them at that time, and no customer would have because it was XY's position that the termination had happened in 2007. So no customer is going to sign up with them because they would essentially be infringing the patents without a license. And so all of it in their – But a customer would have signed up for them if they had a license under the patent, which the jury found that they did. Right, Your Honor, but you have to look at the allegations of their antitrust theory. And at summary judgment, the linchpin was the 2007 termination, and then they have these additional acts. Without the 2007 termination, then there is no other injury that happens. Or if they won a claim, for example, that they would have suffered some additional injury separate and apart from the termination. That is, look, we have the termination, but the fact that they entered into these contracts, we could have, you know, we could have come up with our own technology to supply them with the swords. How can it be a final refusal to deal when it was ineffective? Well, Your Honor, again, we're looking at what the allegations were. That was – they had all along said it was ineffective. Forget about allegations. How – If the refusal to deal was ineffective, how could it be final within the meaning of these 10th Circuit cases? Well, it's the conduct that's at issue, right? XY had been refusing to deal all along because XY believed the termination was valid. They treated it as invalid. They didn't take any license payments. So none of that changed based on the jury's verdict, right? The jury's verdict was a legal finding about what had happened, but the course of conduct is what happened actually from 2004 to 2013. There was a constant refusal to deal throughout that entire period, and that's the allegations of their antitrust complaint. And so the question is, did they point to anything at summary judgment to show that there was new injury caused by these other elements of their antitrust complaint? It's not just the refusal to deal. It's also entering into the long-term contract. Sure, entering, entering. And the long-term contracts, they say, foreclosed those people from dealing with us and that that was an antitrust violation, which may or may not be the case. But those are certainly new acts which caused new injury if, in fact, they were able to offer a competitive product to these people. Your Honor, at that point, they were not, in fact, able to offer that product because XY was treating them as not a licensee. So they could have gone ahead and done it and said, we have a license, right? If they would have pointed to evidence of that in the summary judgment record, that that's what they did, but that's a counterfactual. One, that never happened. And two, the critical point here, given that we're on summary judgment, is they had to point to some evidence of that. If they would have pointed to evidence that said, look, we're going to go ahead and do this anyways. We're going to sign up these customers. In fact, we did sign up customers and then they broke the contract because of this Ingrin deal. Any of that, Your Honor, then maybe this theory would work. But again, at summary judgment, they have to point to some triable issue. And there's no doubt. They still, after reconsideration to appeal brief oral argument, they cannot point to any evidence like that of actual triable injury of a new injury and tellingly in their appeal brief, they cite almost exclusively trial evidence with respect to the acts and the alleged injuries, nothing from the summary judgment record, let alone their summary judgment opposition brief, which is the correct piece of paper to be looking at when you're reviewing the district court's grant of summary judgment. And the district court made this clear in its reconsideration motion, which it didn't have to go into this much detail, but it did. And I would point you to page 51. At the top of it, JA51, it says, in the instant motion, Transova now argues that it suffered two categories of new and accumulating injury. This is on reconsideration, resulting from X, Y, and Ingrin's post-termination letter acts, including these customer agreements. The court will not permit Transova to supplement its response in opposition to summary judgment in the guise of a motion for consideration when such arguments should have been included in the prior briefing. Transova failed to identify a genuine issue of material fact as to the new injury prong of the continuing conspiracy exception, and it may not have a second bite at the apple. And again, on JA53, Transova's belated assertion that reams of admissible evidence support a finding of new injury does not cure its failure to present such evidence in its summary judgment briefing. And then it cites cases that the party has to point them to evidence of a triable issue of fact. It didn't do that then, and it still hasn't done it in its appeal briefs. It doesn't cite its original summary judgment response brief as to where it pointed to evidence that, in fact, it was going to go forward and use the technology and try to sign up customers. Well, it's just a question of how specific they have to be about it, I guess. Well, you know, they have to at least point to some evidence of it, and this is all counterfactual. Well, if they had known the termination letter was ineffective, then they might have done X, and then they might have tried to do Y. Their claim is simple. They say, after the four-year period, there were long-term agreements that prevented other people from dealing with us, and that that caused us additional injury. Your response to that is, well, they didn't have the right to use the technology. Not only did they not have the right to, but they couldn't have used it physically because we weren't supplying them with the materials and all of that that they needed to do it. If they would have said, look, we were on the cusp of ready to sign up these customers, have some affidavit like that pointed, maybe this is a different case, again, they didn't point to that, and they still haven't pointed to that here. They cite trial evidence. This is a summary judgment disposition that's being renewed. The other thing I would say, which I think may make all of this moot, is that this continuing conspiracy exception, although it was granted at summary judgment, the trial court actually let them raise it again at trial. Oh, yeah, but excluding a lot of evidence as to Ingram, right? No, Your Honor. All of that evidence was allowed in, limiting jury instruction. It said, jury, you cannot consider for the merits. You can't consider whether Ingram violated the antitrust laws. But in terms of the continuing conspiracy exception, they asked the district court to reconsider at trial whether now, looking at all of the evidence they've put in, whether they've satisfied the continuing conspiracy exception. XY objected and said, look, you've already decided this at summary judgment. The trial court overruled that, said, no, I'm going to look at the evidence. But then at JA 11429 to 1132, and this is cited in our red brief on page 12, footnote two, the district court then looks at their trial evidence and says, even your trial evidence doesn't satisfy the new injuring prong. They have not appealed that. So even if there was some... So we can consider the trial evidence? I'm sorry, Your Honor. So we can consider the trial evidence? Well, they haven't appealed that, so no. They've only appealed the summary judgment. But my point is, Your Honor, even if there was some defect and we don't think there is... But wait, wait, I thought you said that they asked a trial to have the summary judgment ruling reconsidered and he refused to do that. Why can't we consider the evidence that he considered at that same time? Well, Your Honor, he didn't refuse to reconsider it. He looked at it and said, even now you haven't met the new injury. They don't appeal. The point is a procedural one. They don't appeal that ultimate denial of their continuing conspiracy exception. So not only did they fail at summary judgment, but even if you give them some leeway, they failed at burden, they don't appeal that. So I don't know... Even if you overturn summary judgment, it wouldn't get them anything because it was subsumed within the trial line. What is the JA cite for that? 11... The 11-429 to 11-432. 11-429-11-432. And it's pointed to in our red brief at 12 in footnote 2. We include the citation as well. If there are no further questions about the antitrust claim, if I could turn to the cross appeal because I think that's an important issue on a model and setting an ongoing royalty rate. This court's precedents indicate that once a jury has set a royalty rate using the Georgia Pacific factors and set a reasonable royalty rate, of course the district court can deviate from that royalty rate in setting an ongoing rate, but it has to look at changed circumstances from when the jury already assessed it. So the jury assessed it based on the hypothetical negotiation at the time infringement started. So has there been some change in economic circumstances that warrants a departure? Usually, as this court said in the motto, what that means is because there's now been an infringement and... We understand that your argument is these royalty rates need to be an economic-based analysis. And I guess what I'm wondering is are you, you know, ongoing royalty rates have been characterized as an equitable remedy. Is there no room for any kind of equitable consideration in this royalty rate calculation for the ongoing royalty? Your Honor, there may be, in theory, there's certainly none that are presented on the facts of this case that would... Because what you're trying to do is... Can you imagine a scenario where it would? I mean, offhand, I cannot imagine a scenario where you would want to depart from the jury's calculation of the reasonable royalty rate. And the reason I say that is twofold. One is because a motto says change economic circumstances. It doesn't say equitable circumstances. Surely there are circumstances where there is new technology introduced in the market and the license becomes less valuable. Absolutely. That's a classic economic circumstance that a court could take into account in making the royalty rate lower. Here, though, it was the opposite case. At JA-27, the district court acknowledges, in fact, this technology has become more valuable. So that would support an upward adjustment in the royalty rate. What remedy are you looking for on your cross-appeal? To go back for a trial with damages experts? No. Back to the jury? No, Your Honor. The jury has already set the rate. We're not challenging the jury rate. This is just the district court's calculation of the ongoing rate. So we would just have a remand back to the district court to redo the ongoing royalty rate consistent with the court's guidance in a motto. And even apart from the equitable circumstances, Judge Chen, here, that was one piece of it. But what was primarily driving the district court's departure downward from the royalty rate was not the equitable circumstance, but the prior royalty agreement from 2004 that the party's into at 10%. Well, that was in front of the jury at Georgia-Pacific. In fact, it's one of the primary factors that the jury considered in setting the 15% rate, started with the 10% rate, and because of the greater demand of this technology and all of the other Georgia-Pacific factors, it landed at 15%. For 2009? Well, yes, starting at infringement in 2009. And so then the court, to say, well, I'm gonna average that with the 2004 royalty rate, one, that departs clearly from a motto which says you look at changed circumstances. It's obviously not a changed circumstance. It's exactly what the jury considered, the 2004 rate. But two, to then average that with the jury rate is double-counting it. The jury rate already depressed it. It would have been higher than 15% if you didn't have a 10% baseline, but then to average the jury rate with that 10% agreement again double-counts it and depresses it further. So even putting aside the equitable circumstance, even if it could account for the unclean hands, the primary thing it did here was average it with that prior license agreement which squarely is part of the jury rate that was already set and that is not to be revisited by the court in setting the ongoing royalty rate. I understand what you're saying. I just think this footnote in a motto doesn't get you quite as far as you'd like. No, and I don't wanna rely just on the footnote in a motto, Your Honor. I wanna rely on the text which says that the court is exercising, when it's doing an ongoing royalty rate, is looking at things that have changed, whether you wanna call them economic circumstances or not, things that have changed since when the jury calculated it. So you gave the classic example which maybe the bottom is falling out of the market for this technology because something else has come up new. That's the type of stuff the jury's supposed to consider and as a motto said, in particular you're supposed to give up a bump to the patentee because now you have an infringement and non-validity finding. We have that here, so you should get a bump up from 15% and then as to your market-based factor, at J27 the district court acknowledged that cut in our favor as well. So we should be well above 15%. I just wanna be sure I understand. You keep telling us that circumstances have changed but that it would be inappropriate to have a further trial proceeding to provide evidence of changed circumstances. You're just saying that your word should be accepted by the court even though they may argue with you? No, Your Honor. So the district court didn't disagree with any of these. So my understanding of how these proceedings work is the jury sets the rate then as for the ongoing royalty rate, the district court then has a hearing and says okay, now I have to set the ongoing royalty rate. Is there any evidence of changed circumstances such as the market falling and the parties would have a chance to submit evidence on the briefs and then the court has a hearing and sets an ongoing royalty rate looking at that. That's what happened here. It set the ongoing royalty rate though by averaging a 10% rate with the jury 15% rate and came to a 12.5% rate and we think that was legal error for it to double count the 2004 agreement which the jury had already accounted for. So all we're looking for is a remand. There doesn't have to be any new evidence, no nothing, no new evidence of any kind. Just tell remand to the district court to apply it consistent with a motto and only take into account not the prior license agreement which was not a new circumstance. So that would be the nature of the remand. Thank you. We'll hear from the other side on the cross appeal and you've saved a minute, Marie Petal. Thank you, Your Honor. Ma'am, please record. The elephant in the room is unclean hands. My opponent is arguing that there should be a remand to the district court. How does unclean hands help you? Unclean hands is an equitable consideration. Unclean hands was terminating the agreement in 2007. That's the unclean hands? Yes. So why should that affect the continuing royalty right? Because when a court is considering setting inequity, all the considerations that should apply, that consideration is one that our opponent is urging. The district court should have ignored and however you dress it up, they're asking for a remand essentially with instructions of the district court to use the jury's award as a floor with an instruction implicitly or explicitly to the district court to ignore unclean hands. Is there any case law you have that can support the idea of some kind of inequitable act that occurred a decade ago should be a consideration or can be a consideration for an ongoing royalty right? No, Your Honor. There's neither authority supporting that nor contrary to it. There is no authority that the other side suggests for ignoring a jury finding related to unclean hands that went to the very essence of this dispute. Was the unclean hands point argued to the jury in connection with the royalty rate with the royalty award that the jury made? No, it was argued and the jury verdict reform reflects it in connection with a violation of their their duty of good faith and fair dealing. Well, if it was relevant to the royalty rate, why wasn't it argued to the jury for that purpose? Your Honor, and this gets to the notion that somehow this was baked into the jury verdict. It would have been error to instruct the jury to consider an equitable factor like unclean hands in arriving at the legal remedy of the damages. So only the court can consider unclean hands for a continuing royalty but the jury can't consider it in setting the initial royalty? That's correct. Okay. Could you respond really briefly to A11-1429 to A11-1431 that the other side cited to as the district court revisiting your continuing conspiracy exception and then concluding again that it didn't work and then I guess this hasn't been appealed to us? Your Honor, we don't disagree with the notion that the district court went back and said that the sufficient evidence hadn't been presented. We agree. No, no, but what they're saying is that we can't consider the trial record because you only appealed the grant of summary judgment and not the, whatever it was, reconsideration. How did this come up at the trial? Did you ask them to reconsider the summary judgment ruling? Yes. I don't understand why appealing from the denial of summary judgment wouldn't encompass the denial of reconsideration. I would concede that that's correct. But I would respectfully point the court to JA-43. That's where the district court initially looked at the evidence presented in the opposition to the motion for summary judgment. That's where the court did not extend the required assumptions by Rule 56. It's instructive what the district court said in JA-43. The evidence shows that Transova's injuries began when counterclave defendants prevented it from fairly competing by purporting to terminate the agreement. Began. So the court implicitly acknowledged that it was the beginning of the injury. It said that on JA-43. But it never went on to evaluate the evidence. I mean, if you look at the next page, there's no consideration of the evidence that the court identifies in 41. And it strongly suggests that the evidence that the injuries began and continued, and indeed they did, or at least there was a triable issue of fact as to whether they did. But our position on summary judgment is that the court didn't overlook that evidence, never actually analyzed it. What would you say is the best thing in your opposition to the summary judgment motion that you can point us to on a particular page of it that proves up that you made a case for what the new injury is that's separate from the act of terminating, illegally terminating the license? Your Honor, the appendix 3759 and the excerpts from the record, the testimony, and from the declaration of our expert, which goes through, what page of your SJ op? Well, I'm looking at the joint appendix. If you give me a moment, I'll look at the op itself. Yes, please. I don't think the summary judgment opposition is in the joint appendix, is it? Portions of it are, and that's what I was referring, Your Honor, to. Okay. And I'll be happy to refer to it because it is replete. The opposition is replete with evidence largely coming from the notion of these long-term contracts but relying heavily on Dr. Dermambus with evidence put forward in the opposition. And this is, again, I understand, contrary to the district court's reconsideration motion where it said, you never presented this evidence to me. We would respectfully disagree, particularly given the presumptions that were necessary and were not really acknowledged by the court at all. It's okay. We can review it ourselves. But to answer your question, Your Honor, in the joint appendix, 3759, 3787, 3847, 3864, 3865, 4077 to 4079 in the joint appendix. Okay. I can repeat that, but these are excerpts from the opposition to the motion for summary judgment and the affidavit supporting it. It's not there in its entirety, but the court looks at the entire motion and the exhibits. I don't see how one could not conclude that there was at least a genuine issue of material fact with respect to new and accumulating evidence. Okay. Any more questions? Any more questions? Thank you. Your Honor, I hope I haven't confused matters in my citations to the joint appendix. No, we understand. Our rules prohibit including in the joint appendix pages other than those that are cited in the briefs. Thank you, Your Honor. Thanks to the panel. Thank you. And Mr. Shah, you saved one minute for rebuttal on the cross-appeal. You'll have to talk fast. Sure, Your Honor. The only point I would make on rebuttal, unless there are questions, is that there is no rationale that's consistent with any law on how you do ongoing royalty assessments that would allow the district court to average a preexisting license agreement which the jury used to set the 15% royalty rate with the jury royalty rate. It would be double counting it and looking at a past license agreement, a past economic circumstance that the jury's already taken into account and then giving it different weight. That is precisely what the district court is not supposed to do. It's supposed to look at new circumstances, whatever those new circumstances would be. Well, basically they're saying that the district court has the technical discretion to punish you for your unclean hands' conduct by lowering the royalty rate. Well, Your Honor, it's supposed to set a reasonable royalty rate. There isn't any law that we're aware of that allows them to do that. In fact, the SIDAC article that we cite looks at all 35 cases that have been published on ongoing royalty rates. Exactly zero of them have a ongoing royalty rate set below the jury rate. And the reason for that is because as Amado explains, in almost every case, the patentee's bargaining position will have strengthened from that at the time that infringement began because there's now an infringement verdict. There's now a non-invalidity verdict. So the only way the court could go down for that, I'm not saying it can't go down, but it's to take into account precisely the type of circumstance, Judge Dyke, that you set forth, is, oh, well, maybe the bottom fell out of the market for this technology. It's no longer in demand. A licensee wouldn't want to pay that same royalty rate. But again, the evidence goes exactly in the opposite direction here. So this is a legal error that the district court should be directed to fix and do the type of analysis that every other district court has done in the last decade since these ongoing royalty rate determinations have become common after Amado. Are there no further questions, Your Honor? No questions. Thank you. Thank you both. The case is taken under submission.